GRAHAM**HOLLIS** APC
Graham S.P. Hollis (SBN 120577)
ghollis@grahamhollis.com
Vilmarie Cordero (SBN 268860)
vcordero@grahamhollis.com
Nathan Reese (SBN 283150)
nreese@grahamhollis.com
3555 Fifth Avenue, Suite 200
San Diego, California 92103
Telephone: 619.692.0800
Facsimile: 619.692.0822
Attorneys for Plaintiff WILLIAM MILBURN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM L. MILBURN, individually and on behalf of all other current and former similarly situated and aggrieved employees of DEFENDANTS in the State of California,<br><br>Plaintiff,<br><br>v.<br><br>PETSMART, INC. and DOES 1 THROUGH 50, inclusive,<br><br>Defendants. | Case No.:    1:18-CV-00535-DAD-SKO<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:        November 6, 2018<br>Time:        9:30 a.m.<br>Dept:        5<br>Judge:       Dale A. Drozd<br><br>Complaint Filed: October 27, 2016<br>Trial Date: None set |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................................1

II. FACTUAL BACKGROUND ...............................................................................................2

    A.    Plaintiff's Claims and Procedural Background..................................................2

III. SETTLEMENT TERMS AND RELIEF OBTAINED ......................................................3

IV. LEGAL ARGUMENT..........................................................................................................8

    1.    The Amount of the Settlement is Fair and Reasonable Based on the Potential Value of the Claims in Light of the Strengths and Weaknesses of the Claims Presented.....................................................................................10

    2.    The Results Achieved ...........................................................................14

    3.    The Risk, Expense, Complexity, and Duration of Further Litigation...................16

    4.    The Views of Experienced Counsel.....................................................16

    5.    Conclusion. ............................................................................................21

GrahamHOLLIS APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION

## TABLE OF AUTHORITIES

**Page(s)**

### United States Supreme Court Cases

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)..................................................................................................17, 18

*Boeing v. Van Gemert*,
  444 U.S. 472 (1980)............................................................................................................7

*Crown, Cork & Seal Co. v. Parker*,
  462 U.S. 345 (1983)..........................................................................................................18

### Federal Cases

*Armstrong v. Bd. of Sch. Directors*,
  616 F.2d 305 (7th Cir. 1980), overruled on other grounds by *Felzen v. Andreas*, 134
  F.3d 873 (7th Cir. 1998)....................................................................................................9

*Barbosa v. Cargill Meat Sol. Corp.*,
  297 F.R.D. 431 (E.D. Cal. 2013) ...................................................................................7, 16

*Berry v. School Dist. of City of Benton Harbor*,
  184 F.R.D. 93 (W.D. Mich. 1998) .....................................................................................9

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) .............................................................................................9

*Chem Bank v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) .........................................................................................10

*Cotter v. Lyft Inc.*
  176 F. Supp. 3d 930 (N.D. Cal. 2016) .............................................................................19

*Culley v Lincare Inc.*
  236 F. Supp. 3d 1184 (E.D. Cal. 2017)............................................................................19

*Dennis v. Kellogg Co.*,
  697 F.3d. 858 (9th Cir. 2012) ..........................................................................................21

*Dunleavy v. Nadler*,
  213 F.3d 454 (9th Cir. 2000) .............................................................................................8

*Garcia v. Gordon Trucking, Inc.*,
  No. 1:10-CV-0324 AWI SKO, 2012 WL 5364575 (E.D. Cal. Oct. 31, 2012)....................20

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1988) ...............................................................................9, 17, 18

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

*Hopson v. Hanesbrands Inc.*,
  No. CV-08-0844 EDL, 2009 WL 928133 (N.D. Cal. Apr. 3, 2009) ...................................20

*James v. City of Dallas*,
  254 F.3d 551 (5th Cir. 2001) ...................................................................................17

*Knight v. Red Door Salons, Inc.*,
  No. 08-01520 SC, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ........................................6

*In re Mercury Interactive Corp. Securities Litigation*,
  618 F.3d 988 (9th Cir. 2010) .....................................................................................7

*In re Mid-Atlantic Toyota Antitrust Litig.*,
  564 F. Supp. 1379 (D. Md. 1983) ...............................................................................9

*Molski v. Gleich*,
  318 F.3d 937 (9th Cir. 2003) ...................................................................................17

*Moreno v. Autozone, Inc.*
  No. Co5-04432 MJJ, 2007 WL 1650942 (N.D. Cal. June 5, 2007) ..................................19

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ...............................................................................15

*Officers for Justice v. Civil Service Comm'n*,
  688 F.2d 615 (9th Cir. 1982) ..............................................................................10, 15

*Paul, Johnson, Alston & Hunt v. Graulty*,
  886 F.2d 268 (9th Cir. 1989) .....................................................................................7

*Powers v. Eichen*,
  229 F.3d 1249 (9th Cir. 2000) ...................................................................................6

*Six Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) .................................................................................21

*Stewart v. San Luis Ambulance, Inc.*,
  878 F.3d 883 (9th Cir. 2017) ...................................................................................14

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) .......................................................................................9

*Van Bronkhorst v. Safeco Corp.*,
  529 F.2d 943 (9th Cir. 1976) ...................................................................................10

*Ventura v. New York City Health and Hosp., Inc.*,
  125 F.R.D. 595 (S.D.N.Y. 1989) ...............................................................................18

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ...................................................................................7

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL
APPROVAL OF CLASS ACTION

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

**State Cases**

*Amaral v. Cintas Corp. No. 2*
   163 Cal. App. 4th 1157 (2008) ...........................................................................19

*Iskanian v. CLS Transp. L.A. LLC,*
   59 Cal. 4th 348 (2014) ........................................................................................19

*Kilby v. CVS Pharmacy, Inc.*
   63 Cal. 4th 1 (2016) ............................................................................................12

*Laffitte v. Robert Half Int'l Inc.,*
   1 Cal. 5th 480 (2016) ............................................................................................7

**Federal Statutes**

28 U.S.C. § 1441 ..........................................................................................................3

29 U.S.C. § 207 ............................................................................................................3

29 U.S.C. § 211(c) .......................................................................................................3

29 U.S.C. § 216(b) .......................................................................................................3

**Federal Rules of Civil Procedure**

Federal Rules of Civil Procedure 23 ...............................................................17, 21

**California State Statutes**

*California Labor Code* § 203..................................................................................1, 12,

*California Labor Code* § 226.......................................................................................14

*California Labor Code* § 2699(i)..................................................................................5

*California Labor Code* § 2699(e)(2)......................................................................19, 20

**Other Authorities**

4 Alba Conte & Herbert Newberg, *Newberg on Class Actions,* vol. 4 (4th ed. 2002),
   § 11.25............................................................................................................8, 9

*Manual for Complex Litigation* (Fourth) (2004), § 21.632 .......................................9

5 James Wm. Moore et al., *Moore's Federal Practice,* § 23.22 (3d ed. 1999) .....................17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL
APPROVAL OF CLASS ACTION

## I.   **INTRODUCTION**

Plaintiff William Milburn ("Plaintiff") seeks preliminary approval of a non-reversionary $1,350,000 class action settlement on behalf of himself and other similarly situated individuals and aggrieved employees who worked for PetSmart in California.

PetSmart is a specialty retailer of pet services and supplies. PetSmart operates pet superstores and PetsHotels throughout North America. PetsHotels are located within some, but not all, PetSmart store locations. There are approximately thirty-three PetsHotel locations in California. Each PetsHotel typically has one supervisor.

Plaintiff worked as a PetsHotel Manager at a PetsHotel located in Fresno. All PetsHotel Managers were classified by PetSmart as exempt employees. In April 2015 PetSmart changed the job title of Plaintiff and other PetsHotel Managers to PetsHotel Leaders. PetsHotel Leaders were classified by Petsmart as non-exempt employees. Plaintiff alleges that PetsHotel Managers were misclassified as exempt and as a result were not paid overtime and were not provided with compliant meal and rest breaks along with other related wage and hour violations. Plaintiff alleges that PetsHotel Leaders, although properly classified as non-exempt, were nevertheless not always paid for all work performed and were not always provided with compliant meal and rest breaks.  Plaintiff, as a former employee, alleges that he along with other former employees who are members of the PetsHotel Manager Class and the PetsHotel Leader Class were not paid all of their wages at the time of separation of employment and thus seeks waiting time penalties pursuant to California Labor Code Section 203 as members of the Waiting Time Penalty Subclass. In addition, and while employed in both job positions, Plaintiff alleges that he, and other aggrieved employees who worked in the PetsHotels were not provided with suitable seating. The employees who Plaintiff alleges were not provided suitable seating in the PetsHotels are the PetsHotel Managers, the PetsHotel Leaders along with other employees who worked in the PetsHotels who had job titles of Assistant Manager, Assistant Leader, Store Lead, Senior, Overnight PetCare Specialist and Guest Services Associate.

This settlement is an excellent result for Class Members and was reached after extensive investigation by the Parties, including a thorough analysis and review of Defendant's employment policies, Class Members' time and payroll records during the Class Period, in-depth Class Member

1

interviews, and a full-day mediation before Mark Rudy, an experienced mediator well-versed in wage and hour class actions. The Settlement is also strongly supported by experienced counsel, who carefully considered the strength of the claims and Defendant's potential defenses, as well as the expense, complexity, risks, and likely duration of continued litigation. In light of the Parties' support for the Settlement, and because it satisfies all of the criteria for preliminary settlement approval under California law and relevant Federal authority, and will provide significant monetary recovery to Class Members, preliminary approval of the Settlement is appropriate and should be granted.

## II.   FACTUAL BACKGROUND

### A.   Plaintiff's Claims and Procedural Background

On October 27, 2016, William Milburn filed this class and representative action in the Fresno County Superior Court, entitled *Milburn v. Petsmart, Inc.*, Civil Case No. 16CECG03484.  Plaintiff alleged multiple causes of action under the California Labor Code that primarily derive from his allegation of misclassification as an exempt employee for:  (1) failure to pay overtime wages under Labor Code §§ 510, 1194, 1198, and IWC Wage Order 7-2001 § 3; (2) failure to provide regular and minimum wages under Labor Code §§ 1197, 1194, 1198, and IWC Wage Order 7-2001 § 4;  (3) failure to provide meal periods under Labor Code §§ 226.7, 512, 1198, and IWC Wage Order 7-2001 § 11; (4) failure to provide rest periods under Labor Code §§ 226.7, 1198, and IWC Wage Order 7-2001 § 12; (5) failure to provide and maintain accurate itemized wage statements under Labor Code § 226; (6) failure to pay wages due during employment under Labor Code §§ 204(a), 1198, and IWC Wage Order 7-2001 § 4; (7) failure to pay wages due upon separation of employment under Labor Code §§ 201, 202, 203; (8) failure to maintain accurate records under Labor Code § 1174; (9) violation of Business and Professions Code §§ 17200 *et seq.*; (10) civil penalties under the Private Attorneys General Act ("PAGA"), Labor Code § 2698, *et seq.*; and (11) failure to provide suitable seats under PAGA, Labor Code §§ 1198, 2698 *et seq.*, and IWC Wage Order 7-2001 § 14.

Plaintiff initiated discovery to PetSmart and obtained all relevant documents concerning PetSmart's policies and procedures including job descriptions for PetsHotel Managers and PetsHotel Leaders. Plaintiff also obtained contact information for the other current and former PetsHotel Managers and PetsHotel Leaders and was able to conduct many interviews to investigate the nature and extent of

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

the alleged claims.

After conducting independent investigation of the allegations, the Parties agreed to engage in settlement negotiations and agreed to attempt to resolve Plaintiff's claims through private mediation. (Declaration of Graham S.P. Hollis ("Hollis Decl.") ¶[18].)   On January 4, 2018, the Settling Parties participated in a private mediation with mediator Mark S. Rudy, Esq., which, after much further negotiations between the parties, resulted in a Stipulation and Settlement Agreement. (Id. at ¶16.)

On March 20, 2018, Plaintiff filed a First Amended Complaint ("FAC"), adding two causes of action for failure to reimburse necessary business expenses (Labor Code § 2802) and violation of the Fair Labor Standards Act ("FLSA") (29 U.S.C. §§ 207, 211(c), 216(b)).  On April 18, 2018, PetSmart filed a Notice of Removal, removing the action to the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 1441.

In sum, the parties engaged in extensive negotiations conducted at arms-length and free from collusion.  Each party is represented by experienced class action attorneys with specialized knowledge of class action employment law.  In order to reach the final Settlement, the parties discussed and resolved many difficult legal and factual issues, in some cases with little or no governing law to guide them. During this process both sides were required to make reasonable compromises in light of the facts, issues, and risks presented. In particular Class Counsel considered the uncertainty and risks of further litigation, and the difficulties inherent in such litigation. Class Counsel also considered the burdens of proof necessary to establish and maintain class certification and then to establish liability against Defendant and to defeat all the defenses raised by Defendant.  All of these factors indicated that the best interests of the Class Members would be served by a settlement of this action in the manner and upon the terms set forth in the Joint Stipulation of Settlement and Release.

### III. SETTLEMENT TERMS AND RELIEF OBTAINED

The general structure and terms of the settlement are straightforward: following preliminary approval, notice will be distributed and all Class Members who do not opt-out of the settlement (collectively, the "Participating Class Members"), will then receive their individual settlement allocations following final approval. (Hollis Decl., Ex. 1 (the "Agreement").) The basic terms of the Settlement Agreement are as follows:

**Settlement Amount:** Defendant will pay a Maximum Settlement Amount in the amount of $1,350,000, which shall include the Settlement Administrator's costs for administering the settlement (not to exceed $25,000); Class Counsel's award of attorneys' fees ($450,000); Class Counsel's reasonably incurred litigation costs (not to exceed $15,000); the individual Enhancement to the Class Representative ($5,000); the amount to be paid to the California Labor and Workforce Development Agency($255,000). The Maximum Settlement Amount does <u>not</u> include the employer's share of the applicable payroll taxes. Although Defendant will not oppose Class Counsel's request for the stated amount of fees and costs or for the Class Plaintiff's enhancement request, the award of such amounts is subject to Court approval and the settlement is not conditioned upon the Court granting theses requests. (Settlement Agreement ¶1.41)

**Scope of the Settlement Class:** The Settlement Class is comprised of all persons who are members of the PetsHotel Manager Class, Waiting Time Penalties Subclass, PetsHotel Leader Class, or PetsHotel Seating Class.  (Settlement Agreement at ¶1.5.) The "PetsHotel Manager Class" means any individual employed by PetSmart in an exempt PetsHotel Manager position in California during the period four years back from the date the original Complaint was filed, October 27, 2012, through April 13, 2015 and who does not timely opt-out of the Settlement Class. (*Id*. at ¶1.18.)  The "PetsHotel Leader Class" means any individual employed by PetSmart in a non-exempt PetsHotel Leader position in California at any time from and after April 13, 2015 through the Preliminary Approval Date and who does not timely opt-out of the Settlement Class. (*Id*. at ¶1.26.) The "PetsHotel Seating Class" means all members of the PetsHotel Manager Class, and the PetsHotel Leader Class, as well as any individual employed in a PetsHotel in California from October 27, 2015 through the Preliminary Approval Date as an Assistant Manager and/or Assistant Leader, Store Lead and/or Seniors, Overnight PetCare Specialist, or Guest Services Associate. (*Id*. at ¶1.37.) The "Waiting Time Penalties Subclass" means all members of the PetsHotel Manager Class and/or the PetsHotel Leader Class whose employment with Defendant ended at any time from and after October 27, 2013 through the Preliminary Approval Date. (*Id*. at ¶1.49.)

**Settlement Administration:** Rust Consulting, (the "Settlement Administrator") will provide notice to all Class Members. The Settlement Administrator will initially undertake address verification measures including utilization of an Accurint skip trace as well as searching the National Change of Address Database maintained by the United States Postal Service. This will ensure that all reasonable

Graham**Hollis** APC
3555 Fifth Avenue Suite 200
San Diego, California 92103

4

measures have been undertaken to obtain the most up to date address for Class Members <u>before</u> the Settlement Notice is mailed.  The terms of the Settlement do not require Class Members to undertake the burden of completing and returning a claim form.  Should any Class Member wish to opt out the Notice of Settlement will explain how inform the Settlement Administrator that they do not wish to participate in or be bound by the terms of the Settlement. Class Members will have sixty (60) days to provide notice of their desire to opt out of the Settlement to the Settlement Administrator from the date of mailing of the Settlement Notice. Class Members who do not opt out of the Settlement will be entitled to their pro rata share of the Settlement. (*Id*. at ¶2.5.)

**Settlement Allocation:** The settlement funds are allocated fairly and no Class or Class Member is receiving preferential treatment. The Net Settlement Fund (NSF) amount (i.e. after deductions for Settlement Administration fees and costs, Class Counsel fees and costs, and enhancement payment to the Class Representative.) will be divided between the classes as follows:

The PetsHotel Seating Class claims are allocated $300,000.00 from the NSF.  As this claim is brought under the P.A.G.A. 75% of this amount (i.e. $225,000.00) shall be paid to the Labor and Workforce Development Agency (LWDA). The remaining 25% (i.e. $75,000.00) shall be paid pro rata to each member of the PetsHotel Seating Class according to the relative number of work weeks worked by each PetsHotel Seating Class Member during the PetsHotel Seating Class Period from October 27, 2015 through the date of Preliminary Approval.  This 75/25 percent allocation of PAGA penalties is the required allocation pursuant to Labor Code Section 2699(i). (*Id*. at ¶2.22.)

The PetsHotel Manager Class claims will be allocated eighty per cent (80%) of the remaining balance of the NSF.  The PetsHotel Manager Class Members will each be paid a pro rata share according to the relative number of work weeks worked by each PetsHotel Manager Class Member during the PetsHotel Manager Period from October 27, 2012 through April 13, 2015. (*Id*. at ¶2.2.)

The PetsHotel Leader Class claims will be allocated eight per cent (15%) of the remaining balance of the NSF.  The PetsHotel Leader Class Members will each be paid a pro rata share according to the relative number of work weeks worked by each PetsHotel Leader Class Member during the PetsHotel Leader Class Period from April 15, 2015 through the date of Preliminary Approval. (*Id*. at ¶2.2.)

The Waiting Time Penalties Subclass claims will be allocated seven per cent (5%) of the remaining

Graham**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

balance of the NSF.  The Waiting Time Penalties Subclass Members will each be paid a per capita share of the amount allocated to the Waiting Time Penalties Subclass. (*Id.* at ¶2.22.)

The settlement amount for the PetsHotel Seating Class claims was the result of simple negotiations regarding the strengths and weaknesses of this particular PAGA claim and the parties arrived at the allocation of $300,000 as the total settlement amount for this claim with the assistance of the mediator, Mark Rudy, following lengthy settlement negotiations.  The settlement allocations for the remaining three classes and subclass was based on the respective value of each of the claims according to Class Counsel's damage analysis as explained more fully below and in the Declaration of Graham S.P. Hollis filed in support of this motion. (Id. at ¶45.) No Class or Class Member is being given any kind of preferential treatment as the values of the claims for each class is based on the proportional values of the claims presented on behalf of each class. For example, the amount available to the PetsHotel Manager Class Members is much greater than the amount available to the PetsHotel Leader Class because the overall value of the PetsHotel Manager Class exceeds the value of the claims brought on behalf of the PetsHotel Leader Class as explained herein. No preferential treatment is being given to the Class Plaintiff due to these allocations as he is a member of all of the Classes.

The Settlement Administrator will issue IRS forms and distribute settlement payments out of a qualified settlement fund (QSF). Payments to PetsHotel Seating Class Members and Waiting Time Penalties Subclass Members will be allocated to non-wage payments as penalties and reported on an IRS Form 1099. The payments to PetsHotel Manager Members and PetsHotel Leader Class Members will be allocated 50% to wages, reported on an IRS Form W-2, and 50% to non-wages reported on an IRS Form 1099. (*Id.* at ¶2.2.4.)

**Attorney's Fees and Costs:**  Class Counsel seek an award of one-third, or $450,000 as payment for attorney's fess for prosecuting this Class Action and Representative Action matter. Class Counsel also seeks reimbursement of out of pocket expenses incurred not to exceed $15,000.  Class Counsel will bring a Motion for Attorney's Fees and Costs no later than 14 days prior to the Class Settlement opt-out deadline. In the Ninth Circuit, the typical range of attorneys' fee awards from a common fund recovery is 20 to 33.3 percent, with 25 percent considered the benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). "[I]n most common fund cases, the award exceeds that benchmark." *Knight v. Red Door Salons,*

*Inc.*, No. 08-01520 SC, 2009 WL 248367, at *5 (N.D. Cal. Feb. 2, 2009). Courts in this district routinely approve fee awards in common fund cases at or above 30%. *Barbosa*, 297 F.R.D. at 450 (approving fee award of 33%, and collating nine wage and hour cases approving fee awards of 30-33.3%).

The overwhelming majority of federal and state courts hold that when class action litigation establishes a monetary fund for the benefit of the class members, the court may determine the amount of a reasonable fee based on an appropriate percentage of the fund created. This was recently explained by the California Supreme Court in *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 503 (2016). In group litigation, many class members benefit from the ultimate settlement, but they may not have played a large role in the litigation that led to the payment. *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980). The common fund approach "thus spread[s] fees proportionately among those benefited by the suit." *Id.* Awarding a percentage of the total fund is routinely approved as a fair way to calculate a reasonable fee when contingency fee litigation has produced a common fund. *See, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002).

Plaintiff will provide detailed briefing on their request for attorneys' fees in a separate motion. *See In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010). Here, Class Counsel seeks attorneys' fees in the amount of $450,000, representing 33.33% from the common fund, pursuant to the Parties' Settlement Agreement. Given that Class Counsel seeks a fee award commonly awarded in state and federal courts in California, Plaintiffs respectfully request that the court defer a detailed attorneys' fee analysis until the motion for attorneys' fees that will follow. This is appropriate since the factors considered in assessing whether the fee award is fair and reasonable (the results obtained, the risk of litigation, the skill required, the quality of the work performed, the contingent nature of the fee, and awards in similar cases) partially depend on Class Members' responses to the notice of settlement. Plaintiff's Counsel provides a summary of this analysis to facilitate approval.

**Non-Reversionary Settlement:** The settlement amount is non-reversionary and if any Class Members opt out of the settlement, amounts allocated to those individuals will not revert to Defendant. (Agreement ¶40.) If checks remain uncashed after 180 days, those amounts will be donated to the Salvation Army's California programs for unemployed and underemployed workers as a *cy pres* recipient.

(*Id*. at ¶2.7.2.)

**Limited Release:** The release is carefully tailored to the claims at issue in the case. Upon the Effective Date, the Class Representative and all Participating PetsHotel Manager Members and PetsHotel Leader Class Members shall be deemed to have released "any and all wage and hour claims, obligations, demands, actions, rights, causes of action, and liabilities under state or local law, whether in law or equity, and related or derivative claims (including under the Private Attorneys General Act) that are alleged or that could have been alleged based on the facts alleged in the Amended Complaint." (*Id*. at ¶1.35.) In addition, upon the Effective Date, the Class Representative and every Participating PetsHotel Manager Member and PetsHotel Leader Class Member who endorses his or her Settlement Check shall be deemed to have released any and all federal wage and hour law claims, obligations, demands, actions, rights, causes of action, and liabilities against PetSmart Releasees, of whatever kind and nature, character and description, that are alleged or that could have been alleged based on the facts alleged in the Amended Complaint. (*Id*. at ¶1.33.) Lastly, upon the Effective Date, the Class Representative and each of the PetsHotel Seating Class Members shall be deemed to have released any and all claims, obligations, demands, actions, rights, causes of action, and liabilities against PetSmart Releasees, under PAGA for underlying violations of the California Labor Code or the California Industrial Welfare Commission Wage Orders for the failure to provide suitable seating.  (*Id*. at ¶1.33, ¶1.34, ¶1.35.)

## IV. LEGAL ARGUMENT

**A.    Class Action Settlements are Subject to Court Review and Approval Under the Federal Rules of Civil Procedure.**

A class action may not be dismissed, compromised, or settled without the approval of the Court. FRCP Rule 23(e). The decision to approve or reject a proposed settlement is committed to the Court's sound discretion. *Dunleavy v. Nadler*, 213 F.3d 454, 458 (9th Cir. 2000) (citing *Linney v.  Cellular Alaska Partnership,* 151 F.3d 1234, 1238 (9th Cir. 1998)). The purpose of the Court's Preliminary evaluation of the proposed Settlement is to determine whether it is within the "range of reasonableness," and thus whether notice to the Class and a formal fairness hearing are appropriate. *See* Alba Conte & Herbert Newberg, *4 Newberg on Class Actions* (2002) ("*Newberg*"), §§ 11.25. The *Manual for Complex Litigation* (Fourth) (2004) *("Manual")* characterizes the preliminary approval state as an "initial evaluation" of the

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

fairness of the proposed settlement made by the Court on the basis of written submissions and informal presentation from the settlement parties. *Manual* § 21.632. At this stage, the Court is not making a final determination on whether the Settlement is fair, reasonable, and adequate, as is ultimately required by FRCP Rule 23(e). Rather, the Court need only decide whether the settlement "appears to fall within the range of possible approval." *Armstrong v. Bd. of Sch. Directors*, 616 F.2d 305, 314 (7th Cir. 1980), overruled on other grounds by *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Berry v. School Dist. of City of Benton Harbor*, 184 F.R.D. 93, 97 (W.D. Mich. 1998) (the court first must determine "whether the proposed settlement is potentially approvable"); *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (likening preliminary approval to a finding that there is "probable cause" to submit the settlement to the class and to hold a full-scale final approval hearing); *Newberg* § 11.25. The Court must consider the due process concerns of absent class members. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

Courts must give "proper deference" to settlement agreements, because "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between the negotiating parties, and the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1988) (quotations omitted.)

**B.    The Proposed Settlement is Fair, Adequate and Reasonable**.

The Court's determination of whether a proposed settlement is fair, adequate, and reasonable is often said to require a balancing of several factors. These factors may include, among others: "the strength of plaintiff's case; the risk, expense, complexity, and the likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (citation omitted.) A discussion of these factors supports the conclusion that the proposed Settlement is indeed "fair, adequate and reasonable." Further,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION

the law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigors of formal litigation. *Chem Bank v. City of Seattle,* 955 F.2d 1268, 1275 (9th Cir. 1992); *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (9th Cir. 1976).

While the final analysis of whether the proposed settlement is fair, reasonable, and adequate is typically made after a hearing, Fed. R. Civ. P. 23(e)(1)(c), Plaintiff provides the Court with an initial assessment of these factors in order to facilitate the approval process. The Ninth Circuit's standard of evaluation of the fairness, adequacy, and reasonableness of a settlement requires this Court to balance several factors: the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. *Officers for Justice v. Civil Service Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982). *See also Chem Bank v. City of Seattle,* 955 F.2d at 1268, 1291 (9th. Cir. 1992). As outlined below, these factors support preliminary approval of the settlement.

**1.     The Amount of the Settlement is Fair and Reasonable Based on the Potential Value of the Claims in Light of the Strengths and Weaknesses of the Claims Presented**

For settlement purposes the lawsuit was basically treated as two claims. First, there was the claim brought on behalf of the supervisors at each of the 33 PetSmart PetsHotels, for being misclassified as exempt employees until 2015, and later after reclassification as non-exempt, for various wage and hour violations and related claims such as for waiting time penalties for those employees who had separated from PetSmart. In addition, there was a lack of suitable seating claim which is a PAGA claim only and although it impacted the PetsHotel supervisors it also impacted other Petsmart employees who worked at various times in the PetsHotel department of the PetSmart store.

The settlement amount for the suitable seating claim is $300,000 and the settlement amount for all the other claims is $1,050,000 for a total settlement of $1,350,000.

The total amount of the potential value of claims for PetsHotel Managers, PetsHotel Leaders and the Waiting Time Class is approximately $4,118,726. The settlement amount for this part of the settlement is $1,050,000, or approximately 25% which is a very good result given the risks presented by a

10

misclassification case which are difficult to maintain class certification and even liability because they depend on class member surveys and thus are susceptible to arguments that the prosecution of such claims requires individualized enquiry.  Similarly, the claims of the PetSmart Leaders class present challenges due to the fact that the class members self-report fairly low violation rates and therefore would be susceptible to challenges to maintain class certification.  PetSmart had compliant written overtime, and meal and rest break policies and the allegation is that the policies were not followed, which again, presents challenges of proof.

The seating claim, is based solely on a PAGA claim based on a violation of Labor Code 1198 and Section 14 of the applicable wage order. The theoretical value of the PAGA claims for the PetsHotel Seating Class is substantial due to the number of mostly part-time employees who may have been impacted each pay period, Petsmart paid its employees weekly rather than the more typical two week cycle. The damages assuming a 100% violation rate for every employee for each one week pay period amounts to $18,658,900. However, in addition to the monetary settlement of the seating claim for $300,000, Petsmart has a instituted a Workplace Seating Policy providing suitable seats when the nature of their work permis the use of seats.  This is of significant value to the current and future employees at the PetsHotels. This will result in a payment to the California Labor and Workforce Development Agency of $225,000 and $75,000 being divided between approximately 3,491 PetsHotel Seating Class Members based on work weeks. The release for PetsHotel Seating Class Members only releases PAGA claims for the allegations of lack of suitable seating as alleged in the First Amended Complaint. (Hollis Decl. ¶37.)

The settlement amount is reasonable in light of the damages calculated for Plaintiffs and the litigation risks. Class Counsel calculated damages for mediation purposes based on: 1) each individual's pay rate, as determined from Defendant's records; 2) each individual's actual days worked, as determined based on data produced by Defendant; 3) an assumption based on interviews with class members that each pay period included approximately an average 7.75 hours of unpaid compensable work time while PetsHotel Managers were misclassified and an average of 0.83 hours of unpaid compensable work time for PetsHotel Leaders for each pay period; 4) an assumption of 100% chance of success on the overtime claims under state and federal law; 5) overtime paid at 1.5 times the regular rate for all hours worked over 40 in a workweek (and over 8 hours in a day under California law) and the calculations assume that

overtime damages are doubled under the liquidated damages provisions of the Fair Labor Standards Act (FLSA);  6) a 50% violation rate for meal and rest periods during the time when Plaintiff and Class Members were allegedly misclassified; 7)  an assumption of a 100% chance of success on the meal and rest break claims; 8) a 10% violation rate for meal and rest break claims during the time plaintiff and class members were reclassified as PetsHotel Leaders; 9) an assumption of PAGA penalties for 10% of the pay periods for overtime violations during the time plaintiff and class members were reclassified as PetsHotel Leaders; 10) an assumption of PAGA penalties for 10% of the pay periods for the meal break violation; 11) an assumption of PAGA penalties for 10% of the pay periods for the rest break violation; 12) an assumption of  PAGA penalties for 10% of the pay periods for the unreimbursed personal cell phone use; 13) an assumption of 100% violation rate for unreimbursed personal cell phone use during the entire class period;  14) an assumption of 100% violation rate for incorrect pay stubs during the time period covered by labor Code Section 226; 15) waiting time penalties based on the number of former Class Members during the period covered by Labor Code Section 203 according to Defendant's records; 16) an assumption of a 100% violation rate for the suitable seating claim for each pay period; 17) an assumption that there were on average 24 employees impacted by not having suitable seating each pay period;  17) an assumption that each of the 33 PetsHotels had one PetsHotel Manager (later on PetsHotel Leader) during each pay period during the class period; 18) an assumption that the penalty imposed for a PAGA penalty would be $100 for a first violation and $200 for a second violation. (Hollis Decl. 29 ¶31.)

Plaintiff also alleged that he along with other employees who worked at the PetsHotel were not provided suitable seating in violation of the applicable Wage Order which requires employers to provide "suitable seats" when "the nature of the work reasonably permits the use of seats. *See, Kilby v. CVS Pharmacy, Inc. 63 Cal. 4th 1 (2016).* Class Counsel calculated potential PAGA damages based on the number of employees working in the PetsHotels during a pay period and assumed a 100% violation rate.

Based on the above assumptions Class Counsel calculated the damages for PetsHotel Managers at approximately $3,121,245 for claims for unpaid overtime (State and FLSA), meal break, rest break and unreimbursed expense violations. Similarly, Class Counsel calculated damages for PetsHotel Leaders at approximately $726,329 for claims for unpaid overtime, meal break, rest break violations, unreimbursed expense violation, inaccurate pay stub violations and PAGA penalties. Class Counsel also calculated

waiting time damages for former employees at approximately $271,152. (Hollis Decl. ¶29.)

In reaching this settlement, Class Counsel carefully considered the strength of the case versus the amount offered in settlement, as well as the risk, expense, and complexity of maintaining class certification through trial. (*Id.* ¶26.)  Class Counsel analyzed the merits of the class claims and each one presented significant hurdles.  For example, Plaintiff's most valuable claims in this case are the meal/rest period and unpaid wages claims, which although Plaintiff believes they are meritorious, are potentially vulnerable to Defendant's defenses. (*Id.* ¶¶27-36.)

Defendant consistently maintained that it properly classified Plaintiff and other Class Members as exempt employees and, therefore, was not required to provide them with meal and rest periods or overtime pay. (*Id.* ¶27.)  Defendant further posited that, even if Plaintiff and Class Members were found to be misclassified, Defendant maintained fully compliant meal and rest period policies throughout the Class Period and that Plaintiff and Class Members were still provided the opportunity to take compliant meal and rest periods. Moreover, because California law does not require recording of rest breaks, Defendant argued it would be difficult to establish if and when a rest break was taken and, at the very least, determine whether a violation occurred. (*Id.* at ¶27.)  Similarly, due to the absence of rules requiring the recording of rest breaks, maintaining certification and calculating damages for the rest period claim would be difficult. (*Id.*) These factors, in addition to information gathered from Class Member interviews, which presented potentially individualized issues among the Class and raised significant obstacles to Plaintiff maintaining class certification. (*Id.*)

The claims of misclassification had the highest value but also held the biggest risk as there are greater challenges regarding maintaining certification and meeting the standards for manageability.  There existed the potential that the Defendant could successfully exploit the existence of potentially individualized issues among Plaintiff and Class Members' scheduled hours of work, and variations among the duties performed at different locations, and at different times during the class period.  The lack of time records always presents a challenge in misclassification cases as the evidence of the amount of unpaid overtime and uncompliant breaks must come from surveys taken of the Class Members. Defendant contends that Plaintiff's estimate of damage was grossly inflated based on its own investigation. (*Id.* at ¶26.) Furthermore, such a showing may have also limited the recovery of Plaintiff's waiting time penalties

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

13

claim under Labor Code 203 because Defendant may have been able to assert that a "good faith dispute" existed that any unpaid wages were due at the separation of their employment. The issue of whether violations of meal and rest period regulations give rise to claims under Labor Code Section 203 and 226 remains an unresolved question. See, Stewart *v. San Luis Ambulance, Inc.,* 878 F.3d 883 (9th Cir. 2017).

As set forth in the accompanying declaration, Class Counsel's damages estimate for the meal/rest period and unpaid wages claims were derived using the average hourly rate of pay for Class Members, the estimated number of Class Members employed by Defendant at any given time, and the estimated number of shifts that Class Members worked each pay period. (*Id.* at ¶29.)  Class Counsel's estimate also took into account that class certification had not been granted, but assumed that Plaintiff would prevail in obtaining class certification, establish liability on all claims alleged, and that Plaintiff's estimate of damages would be awarded in their entirety. (*Id.*)

The Maximum Settlement Amount of $1,350,000 is an excellent result for the Class given the Parties' conflicting evidence, which may have resulted in a jury substantially undercutting the projected value of the claims, if not eliminating some or all them. (*Id.* at ¶41.)

**2.      The Results Achieved**

This settlement represents exceptional value to the class. The reasonableness of the proposed settlement is underscored by the fact that Defendant has potentially viable grounds for not only challenging its liability, but also Plaintiff's estimate of the potential value of each claim – the most valuable of which—the PetsHotel Manager claim for unpaid overtime--Defendant assigned a near zero-dollar value. (*Id.* at ¶27.)   Indeed, since this litigation began, Defendant has vehemently denied any liability for the claims alleged, contending that it followed all applicable law with respect to Plaintiff and Class Members' employment and that even if Defendant were found liable, Plaintiff's estimate of damage was inflated. (*Id.*)   Furthermore, to the extent Plaintiff claims he was subject to illegal policies or procedures during his employment, Defendant maintains that Plaintiff's claims are unique to him alone and are in no way representative of other employees. (*Id.*)

By contrast, the Individual Settlement Payments to Class Members will provide fair and reasonable recovery to the entire Class without further delay. (Hollis Decl. ¶26.) While the amounts paid to Class Members represents a discount on Plaintiff's estimate of the overall exposure to Defendant, this reduction

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

14

represents an extremely reasonable compromise considering the substantial risks Plaintiff would face maintaining class certification and establishing liability on all claims against Defendant. (*Id.* at ¶31.) The Settlement commits Defendant to create a Maximum Settlement Fund that will provide Class Members a significant financial recovery and extinguish the risks attendant to continued litigation and any appeals that would likely be filed following the class certification decision or judgment in Plaintiff's favor. Indeed, such efforts by Defendant would likely result in a delay of several years before this case could finally be resolved, whereas the Settlement provides Class Members with a significant and timely recovery from the $1,350,000 settlement amount, making it well within the range of reasonableness.

Plaintiff contends that he and other Class Members regularly worked shifts in excess of 8 hours a day; however, even if Plaintiff establish liability for misclassification, there would inevitably be factual disputes about how much time each shift was compensable which could reduce the damage award.

The settlement reflects a compromise on all of the disputed issues identified above. Plaintiff's risk of decertification, entitlement to overtime, and the amount of overtime are all disputed; the settlement reflects compromise on all of these issues. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair." *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 628 (9th Cir. 1982). As the Ninth Circuit noted in *Officers for Justice*, "[u]ltimately the amount of the [settlement payments] will be less than what some class members feel they deserve but, conversely, more than the defendants feel those individuals are entitled to. This is precisely the stuff from which negotiated settlements are made." *Id*. The Court should approve the Settlement because the payments to Plaintiffs are substantial, and they represent a reasonable compromise of Plaintiff's FLSA and related state law wage and hour claims.

The settlement also reflects compromise in that it avoids the uncertainty of continued litigation. Even if the Parties obtained judicial resolution on disputed issues, that would take time and resources directed toward litigation. Generally, "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004). Indeed, this settlement avoids expenditures of resources for all parties and the Court, and provides "significant benefit that [Plaintiffs] would not receive if the case proceeded—certain and prompt relief." *Barbosa v. Cargill Meat Sol. Corp.*,

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

1  297 F.R.D. 431, 446 (E.D. Cal. 2013).

2   Assuming approval of the requested fees and costs, approximately $600,000 will be distributed to

3  the Class Members and $255,000 will be distributed to the California Labor and Workforce Development

4  Agency.  (Hollis Decl. ¶xxx.) These are a substantial sums that adequately recognizes the Plaintiff's and

5  Class Members damages as well as claims for penalties held by the State and compensates each of them

6  appropriately. The individual allocation amounts are substantial, and favor settlement approval. The

7  largest of the claims are held by members of the PetsHotel Manager Class and the approximately 56

8  members of this class will receive an average payment of $7,500.  The actual amount recoverable by a

9  particular class member will depend on the number of work week that class member worked. The class

10 member would receive just over $100 per work week, and if a class member worked every week during

11 the class period s/he would receive approximately $12,727.  Although the claims of the PetsHotel Leader

12 class were more modest as they were properly classified, the average payment to each of the approximately

13 89 PetsHotel Class Members will be $885.  There are approximately 42 members in the PetsHotel Waiting

14 Time Penalty Class and each of them will receive approximately $625 in addition to the amounts they will

15 receive due to being members of one or both of the other classes.

16  **3. The Risk, Expense, Complexity, and Duration of Further Litigation**

17  This case has been litigated efficiently, with both Parties cognizant that full-blown litigation would

18 be costly and protracted. Without this settlement, the Parties would face contested class certification,

19 decertification, and summary judgment motions, necessitating additional discovery and costs. Wage and

20 hour trials are complex, expensive, and unpredictable. If Plaintiff and Class Members were to prevail in

21 establishing liability, Defendant would likely appeal. Accordingly, there is no quick and easy route to

22 payment for Class Members absent this settlement. This factor therefore supports approval of the

23 settlement.

24  **4. The Views of Experienced Counsel**

25  Class Counsel's experience is outlined above. As noted there, Class Counsel have extensive

26 experience in complex California wage and hour litigation. Counsel for all parties agrees that the

27 settlement is fundamentally fair, adequate, and reasonable. This settlement agreement is the result of arms-

28 length negotiations, between experienced counsel representing the interests of the Plaintiffs and

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL
APPROVAL OF CLASS ACTION

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

Defendant, facilitated by a skilled mediator, after thorough factual and legal investigation.

**C.      The Proposed Rule 23 Class Should be Conditionally Certified**

**1.      All Rule 23(a) Prerequisites Certification Are Present.**

Parties may settle a class action before class certification and stipulate that a defined class be conditionally certified for settlement purposes. *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003). A proposed settlement class is still subject to the requirements of FRCP Rule 23(a) and (b) which are "designed to protect absentees by blocking unwarranted or overbroad class definitions." *Amchem*, 521 U.S. at 620. However, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Id.* Plaintiff respectfully submits that conditional certification is appropriate because the Settlement Agreement satisfies the requirements of both Rule 23(a) and Rule 23(b)(3).

a. Rule 23(a)(1) —Numerosity

Not including the aggrieved employees who comprise the PetsHotel Seating Class there are approximately 112 putative Class Members. In addition, there are approximately 3,491 members of the PetsHotel Seating Class (Id. at ¶36.) A putative class of this size satisfies the Rule 23(a)(1) numerosity element in the settlement context. 5 James Wm. Moore et al., *Moore's Federal Practice*, § 23.22 (3d ed. 1999).

b. Rule 23(a)(2) —Commonality

The commonality preconditions of Rule 23(a)(2) are "construed permissively." *Hanlon, supra,* 150 F.3d at 1019. The presence of simply one common issue whose resolution will affect all or significant number of the putative class members suffices to satisfy the commonality requirement. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001). Plaintiff's alleged Labor Code violations are common to each member of each class. For settlement purposes, Plaintiff's claims meet the minimum burden of establishing commonality.

c. Rule 23(a)(3) —Typicality

Under this rule's "permissive standards," the representative Plaintiff's claims are "typical" if they are "reasonably co-extensive with those of absent class members." *Hanlon,* 150 F.3d at 1020. The

G RAHAM**HOLLIS** APC
3555 F IFTH A VENUE S UITE 200
S AN D IEGO , C ALIFORNIA 92103

17

typicality requirement is satisfied if Plaintiff's claims arise from the same events or course of conduct that give rise to the claims of other class members and are based on the same legal theory. *Ventura v. New York City Health and Hosp., Inc.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989). All of the PetsHotel Managers including Plaintiff were classified as exempt and all of the PetsHotel Leaders were classified as non-exempt and all allegedly suffered the same labor Code violations. Similarly, Plaintiff is a former employee and as such his claims for waiting time penalties are typical of the Waiting Time Subclass Members. Furthermore, the claims of Plaintiff and the putative Class are based on identical legal theories. Based on the foregoing, the typicality requirement is also satisfied in the settlement context.

### d. Rule 23(a)(4) —Adequacy of Representation

Adequacy requirements are established on the basis that the proposed Class Representative, Named Plaintiff, has no conflict of interest with other Class Members and is represented by qualified counsel. *Hanlon*, *supra,* 150 F.3d at 1020. Plaintiff's Counsel are well-situated to assume the responsibilities of Class Counsel because they are experienced employment and class action litigators who are fully qualified to pursue the interests of the Class. They are adequate class counsel under Rule 23(a)(4) and meet the criteria for fairly and adequately representing the class under Rule 23(g)(1).

### 2. Rule 23(b)(3) —Predominance and Superiority.

The predominance inquiry focuses on the relationship between the common and individual issues, testing whether the proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem Products, Inc., v. Windsor* 591 at 521 U.S. at 623. Plaintiff contends several questions of law and fact are common to his claims and to those of the putative Class and provide a justification for handling the dispute on a representative rather than on an individual basis for settlement purposes. *Id.* Class treatment is also the superior method for resolving all claims in this case because a class action would (1) accomplish judicial economy by avoiding multiple suits, and (2) protect the rights of persons who might not be able to present claims on an individual basis. *See generally Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345 (1983). This is true in the settlement context, because the Court need not consider the manageability (or lack thereof) of a trial. Given the sheer number of Class Members, and resolution of claims spanning nearly ten years, it is clear that class treatment is the superior method to resolve the claims pleaded herein.

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103

### 3. PAGA Penalty Claims.

In a PAGA action, the state is the real party in interest, and the action is "fundamentally a law enforcement action designed to protect the public and not benefit private parties." *Iskanian v. CLS Transp. L.A. LLC*, 59 Cal. 4th 348, 387 (2014). PAGA allows employees to stand in the shoes of the LWDA and recover civil penalties for labor code violations. *See Culley v Lincare Inc.* 236 F. Supp. 3d 1184, 1191 (E.D. Cal. 2017); *Cotter v. Lyft Inc.* 176 F. Supp. 3d 930, 942 (N.D. Cal. 2016).   Courts have discretion concerning the amount of PAGA penalties to be awarded. *See* Labor Code Section 2699(e)(2) "a court may award a lesser amount than the maximum civil penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory."   In this case there is particular probability that a court would exercise discretion to reduce the amount of civil penalties given that the claims involve a claim of a lack of suitable seating and was being sought for employees who sometimes have duties that are not amenable to the use of seats e.g. playing with and exercising the pets and cleaning up after pets. Also, the majority of the employees worked part-time and this could lead to difficulties in calculating the amount of penalties. It's probable that many employees, particularly ones who worked on an abbreviated schedule might not suffer a suitable seating claim if the nature of their work for the time period was such that it could not be performed seated. Nevertheless, assuming liability was found the court is required to award some amount of penalty and the court cannot refuse to award penalties in their entirety. *See Moreno v. Autozone, Inc*. No. Co5-04432 MJJ, 2007 WL 1650942, at *3-4 (N.D. Cal. June 5, 2007); *Amaral v. Cintas Corp. No. 2* 163 Cal. App. 4th 1157, 1210-11 (2008).

The settlement of the seating claim for penalties under the Labor Code's Private General Act of 2004, as amended ("PAGA") for civil penalties in the sum of $300,000, 75% of which ($225,000) will be paid to the LWDA, reserving $75,000 to be paid to the PetsHotel Seating Class, is reasonable and appropriate under the circumstances. The $225,000 portion to be paid to the LWDA was not the result of self-interest at the expense of other Class Members.   Where settlements "negotiate[] a good faith amount" for PAGA penalties and "there is no indication that this amount was the result of self-interest at the expense of other Class Members," such amounts are generally considered reasonable. *Hopson v. Hanesbrands Inc*., No. CV-08-0844 EDL, 2009 WL 928133, at *9 (N.D. Cal. Apr. 3, 2009).

The PAGA penalties for the PetsHotel Seating Class presented particularly challenging difficulties. The PetsHotel Seating Class comprises members of several job classifications of PetSmart employees who worked in a PetSmart Hotel. Members of the PetsHotel Manager Class and the PetsHotel Leader Class were interviewed and provided estimates as to the average number of other PetSmart employees who worked in the PetsHotel area during a pay period. The potential damages were calculated by multiplying the average number of potentially impacted employees in each store (24) by the number of stores (33) by the penalty amount ($100 for the first violation and $200 for the second violation) by the total number of pay periods.

In addition to the PAGA damages allocation for the claims of the PetsHotel Seating Class the settlement includes an allocation of $40,000 for settlement of the PAGA claims which encompass some of the class period for the PetsHotel Leader Class.  The Complaint was filed on October 27, 2016 and included claims under the PAGA.  These claims can go back one year to October 2015 which was during the period after the PetsHotel Managers were reclassified as non-exempt and given the title, PetsHotel Leaders.  Claims are alleged for meal and rest breaks, a small amount of overtime as well as unreimbursed business expenses for use of personal cell phones.  Surveys of the members of the PetsHotel Leader class showed that on average class members had noncompliant meal and rest breaks on average in 10% of their shifts. Additionally, the PetsHotel Leader Class had to use their personal cell phones approximately 10% of the pay periods.  The potential PAGA penalties were calculated at $100 for the first violation and $200 for the second violation. The number of class members was assumed to be 33, one for each PetsHotel location, and the amount of the penalty was multiplied by the number of class members at any given time and then by 10% of the number of pay periods in the PetsHotel Seating Class period. The calculation also assumed a discretionary reduction of the value of the PAGA claim Reduction per Labor Code Section 2699(e)(2) of 50%. This calculation yielded a potential PAGA penalty of $153,950.

The amount to be paid to the LWDA is larger than many other PAGA settlement amounts approved by the courts where seemingly nominal amounts were allocated for such claims. See, e.g., *Hopson, supra,* 2008 WL 3385452, at *1 (N.D. Cal. Aug. 8, 2008) (approving a PAGA settlement of 0.3% or $1,500); *Garcia v. Gordon Trucking, Inc.,* No. 1:10-CV-0324 AWI SKO, 2012 WL 5364575, at *3 (E.D. Cal. Oct. 31, 2012) (approving a PAGA settlement of 0.27%).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL
APPROVAL OF CLASS ACTION

**4. Cy Pres Distribution.**

The Parties anticipate that, as is common in class, collective, and representative actions, there will be some unclaimed funds, even after redistribution of the funds declined through the Opt-Out process. Thus, a plan is required for distributing those unclaimed funds. *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990). Cy pres distribution allows unclaimed funds to indirectly benefit the entire class. *Id.* at 1305. This approach requires the cy pres award to qualify as "the next best distribution" to giving the funds directly to the class members. *Dennis v. Kellogg Co.*, 697 F.3d. 858, 865 (9th Cir. 2012).

"Not just any worthy charity will qualify as an appropriate cy pres beneficiary[;]" and there must be "a driving nexus between the plaintiff class and the cy pres beneficiary." *Id.* Thus, the Parties have designated the Salvation Army's California programs to benefit the unemployed and underemployed workers, which serves such workers in gaining the employment skills and experience necessary to obtain employment and support them during periods of unemployment as the cy pres beneficiary of unclaimed funds.

**5. Conclusion.**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant preliminary approval of the proposed Settlement, grant conditional certification pursuant to FRCP Rule 23 for settlement purposes only, appoint Plaintiff as the Class Representative for the purpose of settlement, appoint Plaintiff's attorneys as Class Counsel, approve as to form the proposed Notice to the Settlement Classes, appoint Rust Consulting. as the Claims Administrator, and to set a final approval hearing date.

Dated: September 26, 2018                    GRAHAM**HOLLIS** APC

By: _____/s/ Graham Hollis_____
Graham S.P. Hollis
Vilmarie Cordero
Nathan Reese
Attorneys for Plaintiff William Milburn

GRAHAM**HOLLIS** APC
3555 FIFTH AVENUE SUITE 200
SAN DIEGO, CALIFORNIA 92103